Case number 52-18-2004 Behrouz and Jackelin Affiliated Family Trust v. Ryan 1999 Behrouz and Jackelin Affiliated Family Trust v. Ryan 1999 Good morning, Your Honors. On behalf of the police and court, my name is James DeVerti, appearing on behalf of Plaintiff Appellant of Behrouz and Jackelin Family Trust. Your Honors, these courts have reversed the trial court for a few reasons, in addition to that stated in our brief. First, affirming the trial court's decision would allow the guarantee in question to become meaningless or an absurdity. Construing the loan documents together, which are relevant in this case as a whole, leads to the only objectively reasonable conclusion, which is that the signatories to that document were personally liable on the loan transaction. Furthermore... To review all the documents together, not just the guarantee agreement, do we have to find an ambiguity or not? Your Honor, I think with respect to reviewing all the loan documents together, you don't necessarily need to find an ambiguity. Well, isn't a lot of it extrinsic evidence? I'm not sure I understand the question, Your Honor. Are you saying just with respect to the documentation, you don't have ambiguity? But, I mean, in order to interpret a lot of that, don't you need the extrinsic evidence to come in? And doesn't California law allow for that? With respect to the ambiguity, Your Honor, yes, I do think the extrinsic evidence adds to the understanding of these documents. But that is in addition to California law requiring that the documents be reviewed together, because it adds to the understanding of what the entire transaction is supposed to mean. And specifically on that point, when you look at the fact that there's a deed of trust, which secures the loan by placing a mortgage on the real estate, in addition to the fact you have a promissory note, which Plaintiff Appellant urges the court to view as the primary debt obligation, which is the responsibility of the obligor free port renaissance LLC. You also have two separate guarantee documents, which were attached to plaintiff's amended complaint. The first guarantee had three signatories. The first being Sharam Ali Azadeh, who signed on behalf of a separate LLC referred to as PCH USA 26. You have Fariba Atiguchi, the defendant appellee in this case, signing as an individual. And then you have Mark Mirabat also signing as an individual. We argued to the court that based on the facts, the reason for the second guarantee being created was that Plaintiff Appellant communicated with Sharam Ali Azadeh's office and his agent, Alan Santos, to state that based on PCH USA 26 LLC being one of the signatories to the guarantee, we needed to see each and all of the members of the LLC being personally liable. And so that was in that e-mail that was communicated to Santos, right? Correct, Your Honor. But that still would be considered technically parole or extrinsic evidence. Right. I think that's correct. Because doesn't the intent trump the language of the contract or vice versa? In this case, Your Honor, we submit to the court that there is an actual ambiguity in that guarantee document because it's a question of whether or not free port renaissance LLC is the guarantor or whether or not the individual members of the LLC are. Because we're back to where we began, and I think that was the initial import of the question. Under California law, if we were going to go with a strict plain language, then you'd have a problem. We have to find an ambiguity if you start getting into extrinsic evidence, don't we? I think that's correct. Okay. The court would need to find an ambiguity. Where does the contract say that? I don't know how to pronounce the name. Is it Adegachi?  Where does in the contract say that he personally guarantees it? Where can you point in that contract that says he's a personal guarantee? Your Honor, Fariba is a female, Your Honor, just to correct the record. Okay. With respect to the guarantee in question, it does state that guarantor is personally guaranteeing the obligations of the abogor, which is defined as free port renaissance LLC. So the document itself, read as a whole, does indicate that it's meant to be a personal obligation. And when you look at the front page of the document, the guarantor is defined as free port renaissance LLC. But on the last page of the document, that's not indicated that free port renaissance LLC is the entity being the guarantor. And there would be no reason in this context for Mr. Adegachi or Mr. Mirabat to have signed as an individual, especially when you look at the documents as a whole. And you can see on the deed of trust that those three members of the LLC explicitly signed as members on the deed of trust. So they distinguished their capacities between those two documents, which is why we urged this court to review the documents together. How do you distinguish the cases that they rely upon? Are you referring to the Ramos and Peck cases here? Yes. The distinction is, one, those cases both involved a question of how the individual was signing. There wasn't a question as much as, well, is there a separate entity signing the guarantee? The issue was there was an individual, Mr. Ramos, and one. The only thing he did was add a notation of whether he was a vice president or president. I don't recall off the top of my head. And it was a virtually identical situation with respect to the Peck case, where you had an individual identified on the guarantee, but then on the signature page the notation of corporate title was added. And the courts there both found, and importantly we have, that with respect to the underlying obligation on a nullity release, the corporate entity had already been bound. There would have been no reason to have a guarantee because it was redundant, absurd, nullity, whatever you want to call it. So you're saying that's analogous here? Correct. So Operation Freeport was already on the hook, so why wouldn't it be the point of having them signed as individuals? That's exactly right. So to continue, Your Honor, as I pointed out, the relevant loan documents, which include the deed of trust, the promissory note, and the two guarantees should be construed together. The distinction is important among those documents in that the members did sign on the deed of trust explicitly as members. The other documents show that they were signing as individuals. How about Sebastian International? Sebastian International? The defendants rely upon basically saying that the signing the name as an individual does not make one personally bound on the guarantee. How is this case different than that? Your Honor, it's different because that involves the concept under California law of descriptio personae. And the important point to note there is that descriptio personae, as it's defined in Black's Law Dictionary, as well as used by both Sebastian International and I think Ramos as well, is that that concept applies to official or technical characters. In other words, if I sign a document and add vice president or MD or some non-human identifier. And a descriptor. Correct. Then that would be descriptio personae. The inclusion of the word individual alone does not fall within that definition. There aren't any California cases we were able to find. And we don't think that Defendant Hopley included in her brief that supported the idea that individual would stand for that proposition of being descriptio personae. So it is distinct in that respect, Your Honor. One point I'd like to correct the record on as well, Your Honors, is that with respect to a reason to overturn the trial court, is that allowing that decision to stand would allow the defendant, Hopley, to avoid liability and guarantee based on drafting errors caused by her agent and business partner, E&E Mortgage Brokers, which was solely owned by Mr. Eliazade, her co-partner. Now, under the general case law, the drafter, who's responsible for having the documents construed against them? The drafters or the other side? Your Honor, we rely on the maximum contract interpretation, which is that the document should be construed against the party who drafts it. With respect to that issue, Defendant Hopley has pointed out in her reply brief that my client had paid for the document preparation fees. That's factually incorrect. In fact, you can actually see in the Kammermann record that Ms. Atiguechi agreed to and knew that her LLC was paying for the document preparation fee. And she also signed the closing documents showing that very fact as the managing member of the LLC. And that's noted in the record on pages 16 and 64, as well as 1783 and 1786. So what that shows is that she had knowledge that Mr. Santos, the document preparer, had put these documents together, and it was under the direction of her business partner, Mr. Eliazade. But she thought that the LLC was paying for it, correct? She knew the LLC was paying for it. She authorized it, whereas she tried to point out in her brief that my client paid for it. But that's not accurate. You can see on the closing statement that my client loaned $600,000. And on the borrower's side of the transaction, the $1,500 document preparation fee was deducted from their loan proceeds. So they paid for it. But can we construe the documents against her based upon the LLC drafting them when she apparently thought that the LLC was paying for it, not them individually or anything like that? So that would go to her state of mind that the LLC was on the hook. I don't think that's correct, Your Honor. And I think how you should view it is that she was aware she was hiring her business partner's company to prepare those documents. It was not a company or an agent hired by my client. So to the extent that they caused that ambiguity, that should be construed against her. That is her agent. She knew that Freeport Renaissance LLC would be the borrower, and the knowledge should also be imputed that she knew she was signing a personal guarantee. I'd also submit to the court that the record would show Ms. Satiegi, she was a licensed real estate agent in the state of California and is a sophisticated party. On that point, the record also shows that my client had required personal guarantees on his prior business dealings with Mr. Eliazadeh, as pointed out in the record at pages 1831 and 1835 through 1837 of the record. This was not their first go-around? It was not, Your Honor. To be clear, I'm not aware that Ms. Satiegi had dealt with my client before, but her business partner had. Your argument is that the ambiguity should be resolved in favor of your client to the extent that we grant summary judgment to your client. That's correct. Do you see that there's any question of fact here at all still remaining? I don't, Your Honor. I don't think there are any facts that are in dispute, especially if the court looks outside the four corners of the agreement at the e-mails which we have submitted. Neither party disputes that those are inaccurate on what either party said of the other. So if the court finds that Mr. Eliazadeh's company and Alan Santos, the drafter, were acting as agents and that my client had a right to rely on those statements, then there wouldn't be a factual dispute. It's clear that when you look at the e-mail, my client wanted each and all of the owners of the LLC to be personally bonded. Well, we know what your client wanted, but what about the intent of the defendant in signing the document? I mean, is that a question of fact now based upon her statements that she never would have personally guaranteed this note? I don't think it is, Your Honor, because the court needs to look at this on an objectively reasonable basis. That's how California law requires these documents be construed. So one of the questions, it's either in the Ramos or Peck case, is what would a reasonable lender in that situation have understood the guarantors is doing? Would they have expected that Freeport Renaissance LLC in this case was also guaranteeing a loan it was already obligated on,  So the point I think we need to take away is that the only way to look at the objective intent of the parties, which can be supplemented by those e-mails, is that a lender was expecting personal guarantees from the borrowers. And the borrowers were expecting only the corporate guarantee from Freeport Renaissance. Well, that's going to be their position. You may not think that, but, you know, intent is difficult from both sides. So, I mean, theoretically, we could, even if we acceded to the correctness of your initial position, remand it for a trial on the issue of what each side's understanding and expectations were. That's another possibility, isn't it? It is a possibility, Your Honor. However, if you look at the reported proceedings, Judge Shores, at the trial level, he found that based on the record before the court that it was clear Mr. Frommian thought he was getting a personal guarantee. It's just a question of what's the objective intent. And I think that is not necessarily a factual question. I think it can be resolved by reviewing the documents together as well as those e-mails. In here, our review is de novo and we apply California law. Do you agree with that? Yes, I think the parties have conceded that California applies to the law in this case, with the one caveat that to the extent that foreclosure is involved, the Illinois Mortgage Foreclosure Law is the exclusive statute that applies to that process. So, I don't know if that's necessarily directly relevant, but for the most part on this guarantee, California law would apply. Is there any evidence in the record that the defendant knew that your client required Elishande to supply a second personal guarantee? I don't know off the top of my head, Your Honor. There may be, but I believe the record showed that Ms. Attivici met at Mr. Eliazade's office to sign the loan documents. One of the partners, I believe, signed in New York, so I don't think everything was signed necessarily at one table, but I would submit that she was presented with these loan documents. She's a sophisticated party and understood what she was signing when she signed them. Counsel, you will have time on rebuttal. May I offer a brief conclusion, Your Honor? Sure, go ahead. Your Honor, plaintiff's appellant does stand by the remainder of the arguments that we have not touched on today in her brief. I ask the Court to reverse and remand for entry of summary judgment on count four in favor of my client and against the defendant, I believe. I appreciate your time. Thank you. Mr. Ampelos? Your time's up. That was quick. Good morning, Justice. I'm sorry. George Ampelos on behalf of Fariba Agatechi of the Apple League. May it please the Court. Judges, the law is not in dispute. The attorneys and the parties have conceded that the choice of law provisions in the underlying documents require interpretation of the California law with the exception of the actual procedural foreclosure law of Illinois. The parties also concede and agree with one another that there are no material facts in dispute. Unfortunately, that's where the common ground ends. Our position is very clear. The guarantee is executed and entered into by Freeport Renaissance. The California law indicates that if the document is clear and unambiguous on its face, you look at the objective intent of the parties from the document itself. Not only does the document state that the guarantor is Freeport Renaissance, it recites that over and over and over numerous times in the footer. It recites it as to the address of the guarantor. So the address of the guarantor is Freeport Renaissance with its actual business address. But the guarantee, doesn't it define the guarantor as Freeport Renaissance, but then the sign block makes no reference to Freeport Renaissance? That's correct, Your Honor. Isn't that relevant? Yes and no. The law of California states to look at the body of the document. And within the body of the document, it's Freeport Renaissance defined as the guarantor. It's our position there's no ambiguity in the document. What's happening is the appellant, and the plaintiff in this case, is attempting to inject ambiguity by arguing an absurdity. That is, as Justice Hudson pointed out, why would a borrower also guarantee its debt? And I have an answer to that question. Let me just hear that answer. Would you like to hear it right now? Yes. I'll tell you why. As is indicated in our brief, California is a unique state, among other things. It had a practice of prohibiting lenders from seeking deficiency judgments from its borrowers on real property. It's called an anti-deficiency statute, and we cite it in our brief. What unscrupulous and clever lenders started to do was say, okay, we'll get around the anti-deficiency statute by having our borrower sign guarantees. So what happened was there was an evolution of common law within the state of California where judges like yourself were striking down those guarantees because they're nothing but the term sham guarantees. Those guarantees are normally by a third person. Normally, in most instances. However, as I pointed out, there's an illustrative case, and I'm going to ask the court for why, of North Carolina, where North Carolina says, as does California, a promissory note is a stand-alone instrument, as is a guarantee. The guarantee is enforceable separate and apart from the promissory note. They're not intertwined with one another. So if, for example, like the case in North Carolina, the promissory note gets lost in the stream of commerce because notes are bought and sold on the open market all the time, you may return to the guarantee for compensation against the underlying borrower. Interestingly, Your Honor pointed out early on in the opening arguments by opposing counsel, don't we look at all the documents in totality? And to some extent do so. I have no objection to that. If you look at the security agreement of this transaction, the security agreement is, of course, the instrument which collateralizes or creates the security interest in the collateral. At the bottom of it, it states borrower and or guarantor. And or guarantor. The security agreement itself contemplated that the guarantor may be the same entity as the borrower. But getting back to Justice Hudson's earlier comments, I need to hit on this a little bit more. California law evolved into such an extent where there's an anti-deficiency statute. The unscrupulous or I'll call them clever lender started using guarantors to get around the anti-deficiency statute. The state court judges caught on, started finding that these guarantees are nothing more than sham guarantees, and said we're not honoring them, we're striking down the guarantees themselves because lenders who are participating in the practice of having the borrower also be the guarantor. And we've laid out an actual case law authority in California where several courts have found the existence of the sham guarantees. That's a reasonable response to the question, but let me ask you this. Obviously, it would have to be your position, would it not, that there is absolutely no ambiguity here in this document? Correct. They speak for themselves. Correct. And then when we get to the signature block, as Justice Shoshot points out, our law in California is persona descripto, descripto persona. And that is the underlying cases with regards to descripto persona is the Peck case, which indicates clearly that titles and notations made after a person's signature to an instrument are known as descriptive of the person rather than the relationship to which he signs the agreement. Those cases kind of cut both ways, though, don't they? They do. For you, I'm talking about, because they support you in that regard, but then they cut against you in the later statements as to why would anybody sign this, you know, on behalf of the maker of a note when the maker of the note is already obligated under the note. That's where your explanation comes in. It goes back to the anti-deficiency statute of California. Well, is this a sham guarantee? It could have been. It's not been found to be a sham guarantee. No, no, but I mean basically under the law of California. Is this a sham guarantee? Yes. If, in fact, it was, if, in fact, the court is inclined to find that it is a guarantee of free port renaissance, our position would be that it was a sham guarantee because it would have been designed only to circumvent the anti-deficiency provisions of the underlying, of the corresponding, not the underlying, but of the corresponding promissory note. Yes, sir. No, the statement of law that Justice Burke just stated, it's unreasonable to construe that the guarantee is binding the corporation when the corporation was already bound anyway. Doesn't Sebastian and Ramos both basically say that? Ramos and Sebastian state that you don't look to the manner by which somebody identifies themselves in the signature of law. That is, if Jane Doe signs it as president or secretary of commerce of the United States government, that has no bearing on the underlying document itself. The document speaks for itself. You look to the content, the internal core of the document, which speaks to free port renaissance being the guarantor. Oh, but I mean nobody, and I mean nobody signs this guarantee on behalf of free port renaissance. Correct. So, I mean, isn't that ambiguous? I mean, you've got free port renaissance, who your argument is, is absolutely the guarantor, and then when it comes to sign the darn thing, and you have the deed of trust where people are signing as members of free port renaissance. They know how to do it. Here they didn't do it. They signed it as individuals, and El Chandra signed it as representative of PCA. So, LLC, P-C-P-H, LLC. If I may speak to that particular issue about the way in which, well, his name is, I'm sorry, you go by Sean, that's what we've been using all this time. For who? For El Chandra, who signed on behalf of his LLC. Interestingly, the appellant apparently picked up on that fact. We see a string of e-mails where he says, hold on, I want guarantees by individuals, and then what they do is they produce an actual personal guarantee, and if you look at the difference between what was presented and signed by my client versus what Sean Alizar ultimately signs, it's a night and day comparison. For some reason, Mr. Aframian, who's the trustee and principal of this trust, goes through the trouble, if you will, of making sure Mr. Alizar signs a personal guarantee. It is a stark contrast, the document that Alizar signs versus what is left to sign. That begs the question, why didn't Mr. Aframian then say to all of those guarantors, you're signing these new documents. We're not going to use this old one. I don't like the format. He was asked in his deposition, had you read the document before? He said no. He answered in the negative. He said, perhaps, I think his answer was, he says, perhaps at most, quote, perhaps at most I just read the headlines or title. Well, that makes sense because he sees that one person, two people signed as individuals, in his mind they're guaranteeing this as individuals, and then he sees one who doesn't sign as an individual, he only signs on behalf of the LLC. It's a 50% owner of Freeport Renaissance, and he says, wait a minute, I don't want the LLC on the hook. I want the guy on the hook. Right, and Santos said to him, you're going to get a blanket personal guarantee from all three. Didn't he say that? But he didn't deliver that. And by the way, we disavow any relationship, my client does, with Mr. Santos. She testified in her deposition, never met him, never talked to him, yet the appellant is attempting to make my client somehow a partner with the LLC. Was he her agent, though? No, he was not. He was not. He was not. He's drafting documents on the hook. Apparently E&E brokers drafted the documents. Our position is on behalf of the appellant, regardless of who paid for it, oftentimes on the settlement statement the bank will charge a document fee to a borrower, to a realtor, to a lender, whomever. Even regardless of who paid the fee for the preparation of the documents, the E&E broker was not acting on my client's behalf as an agent. My client disavows and has never spoken to Mr. Santos at all. Let me just ask you this to get back to this original question. Obviously, you're going to argue we have, there's no ambiguity by the language that seals off any consideration of extrinsic and probable evidence. However, under the Pacific Gas case from California, doesn't it allude to language extrinsic evidence may be preliminarily considered to determine if there is an ambiguity in a contract? Yes. Well, if that's the case, then it opens up Santos testifying clearly the intent was guaranteed individually, not on behalf of the company. So doesn't that create a problem for you when they say preliminarily considered? No. You get into it even though there is no facial ambiguity. No, because that may have been Mr. Santos' intent. We don't know. We're not probing his mind today. You testified to that, didn't you? He did, but he's not my client. My client testified clearly and unequivocally and uncontrovertibly that she had never intended to sign this document as a personal interest. I understand that, but Santos will come in. Go ahead. I'm sorry. I mean, that's her testimony, but obviously if we get into parole extrinsic evidence, the trier of that would consider the testimony of Santos. Would he not? If there was an ambiguity. If there's an ambiguity, but Mr. Santos is not a party to this transaction. He's not a borrower. He's not a lender. He's not a guarantor. He's a third party. He's an employee of E&E Brokers, which apparently was drafting the documents. What Mr. Santos thought or did not think is Mr. Santos. We don't have any control or dominion over his intent. Just to clarify and answer Justice Burke's question, so if two out of the three don't sign as Freeport, in what capacity are they signing? On behalf of Freeport Renaissance. Even though the document doesn't say that. The document says that Freeport Renaissance is the guarantor, and it says it throughout numerous times. It doesn't say it just once. It wasn't a scrivener's error where Freeport Renaissance shows up in one line as a guarantor. It's in there at least six or seven times, indicating Freeport Renaissance guarantee or the address of the guarantor is Freeport Renaissance, and then throughout the entire body of the guarantee is Freeport Renaissance. I think, in fairness to the appellant, the only way to crack open this door or this window for them is if the court were to find an absurdity. But we have provided the court with numerous reasons why it is not an absurdity under the law, and I also will point out that there are stronger provisions in the guarantee than there are in the corresponding promissory note. There's additional waivers in the guarantee. There's additional time extensions by which the lender is given additional concessions, if you will, so that the guarantee language is actually stronger than the language contained in the promissory note, so there are added, if you will, concessions and measures in favor of the lender. Let me ask you this. You give a reasonable explanation as to why somebody would sign a document if the corporation is already on the hook. You talked about the problem in California with deficiency judgments, et cetera. Was that evidence brought into the trial court? Because if not, isn't it yours, the record, as the phrase goes? How would we consider that explanation if it's not anywhere in the trial court record? Well, by the same token, it wasn't, Your Honor. But also, we did. We raised it in response to the argument that there's an absurdity. We did, and we said there's other reasons why a lender may have a maker of a promissory note also sign a personal guarantee. But that was not presented to the trial court. There's no evidence of that. There wouldn't have been any evidence because we— Or affidavits or anything. No, you're right, Your Honor, but it's sort of similar to our argument that, for example, certain states provide that a note is a stand-alone document versus a guarantee, and they can both go their separate ways, and the guarantee is enforceable, and so is the note. And so we did argue that. But there's no—I wouldn't even know what evidence to bring before the court on that point, even if we were to go back and do that. There was no affidavit to be had or no evidence. All we're doing is providing the court with an explanation as to why there may be a situation or several situations whereby a lender may also want the borrower to also sign the guarantor. And we know that there's a body of law in California where this is apparently common practice. I've not seen that in Illinois, by the way, in my years of practice. I've not seen lenders try to skirt an anti-deficiency statute. I don't think Illinois has an anti-deficiency statute, and I think that's probably why we don't see it here. You—I'm reading my notes from reviewing everything, so tell me if I'm wrong. But you said, of course, that your client never personally guaranteed. But during her deposition, I think I recall her saying that she never read the documentation and she just followed the lead of Ella's artist. If I may just answer that question, I don't have a specific answer to that, but I do have these quotes from the deposition that I think are instructive. Who did you understand the guarantor to be? Answer. From Fariba Agatechi. Freeport Renaissance LLC. Question. Why did you understand on the last page the guarantor to be Freeport Renaissance LLC? Answer. Because on the first page of the guarantee agreement, it says the guarantor is common. It's defined actually as Freeport Renaissance LLC, and that's Deposition 94 at 1021. Okay. In her affidavit, she stated she never executed the guarantee in her individual capacity. She never authorized Santos to do so. However, she also testified she never read any of the documents and simply followed his lead, Ella Zada's lead as the managing member of Freeport Renaissance. It may be the case that if that's what the affidavit says, we'll stand by that. Did Santos say that Ella Zada's directed him to create a blanket personal guarantee from all three of them in his deposition? He did. He stated that he took his direction from Sean, who is apparently his boss at E&E, but my client has never had any conversation with Santos, never met him before, and she stood by that throughout these proceedings. If we get into parole evidence, if we say there's some ambiguity in this guarantee, do you lose? No. We end up back down in the trial court. Well, wait, wait. You said both parties concede that there is no material facts in dispute here, and you both filed cross motions for summary judgment, which tells us that you both concede that you don't go back to the trial court. One of you wins, one of you loses. That's because I don't believe there's an ambiguity in the agreement. No, I understand. That's your argument. I'm just saying, if we find there's an ambiguity, counsel's asking for summary judgment for him. I asked him whether there's a question of material fact. He said no. And you started off your argument by saying we concede that there's no material object in dispute here. Yes. And so my question is, if we get to an ambiguity and we start getting into this Santos after Davis and all those things, do you lose? No, I don't think so, and I don't think we can get into what Santos thought because, with all due respect, I don't think he is a party to this transaction. Well, he's a drafter. That has no impact on this at all. He drafted his documents. There's a drafter. He's operating under Alessandri's direction. She is relying on Alessandri according to her testimony, and he's the drafter. So, I mean, you're telling me if you got to trial, he wouldn't testify? His testimony would be irrelevant? No, I don't think it would be irrelevant, but I'll say this much. I think what would be more relevant would be if we're going to get into the subjective intent of the parties. We have Fariba testifying that at no time did she ever intend to sign a personal guarantee. At best, what we have from Beirut, who's our counterpart, is I didn't read the document, I only looked at the headers, and now we have to discern what his intent is after the fact because he didn't even read the document. Neither did she. In all fairness, neither did she, apparently, from what she had testified in her affidavit. But he himself is the one that is the protagonist proceeding with this argument that somehow there's an ambiguity, but we can never discern what his intention is because he didn't read the document. Now, he's coming in after the fact saying, oh, no, I intended everybody to be a guarantor. But then he goes through the process of getting, I'll call it a clean guarantee from Sean Elazar, where it's clear, personal guarantee, and it's a different document, by the way. It's a different format altogether. Why would he not have done that for all of those other guarantors? And that was a question posed by the Honorable Judge Shorts, is that, well, if he did it for him, if he caught that error or whatever you want to call it, why didn't he go back and just do it the same for everybody else? And he didn't. He was derelict. And you can't say, I didn't read the document, I only got it cleared up by one of the guarantors, but I didn't go and clear it up with the others. I don't think that's – I don't think he's doing enough to protect his interests. Thank you, Mr. Hancock. Thank you, Justices. Mr. DiVerti, you may proceed to rebuttal. Thank you, Your Honors. To follow up, a few key points, Your Honors. With respect to California's anti-deficiency laws, those do not apply here. With respect to the deficiency judgment, that aspect of the case is controlled solely by the Illinois Mortgage Foreclosure Law, so there was never a reason in this loan transaction to consider whether or not my client, the lender, needed to get around California's anti-deficiency statute. Deficiencies are allowed under Illinois law. With respect to – also to follow up on that, the note itself has never been disputed as being invalid in the California law. That was never argued at the trial court. The note, in fact, resulted in a default judgment against Freeport-Renaissance LLC. With respect to Sebastian and Ramos, neither of those cases incorporated a sham guarantee defense either, and they support our theory of the case, which is that having the same party sign a guarantee just makes an underlying – which is already obligated on a note, the guarantee is then nullity or just redundant, and that is the absurdity. How do you respond to his argument about the quote-unquote clean guarantee? Why do it for one and not for all? Your Honor, that's answered best by the fact of what the objective intent of the parties can be best understood as, which is that the first guarantee shows two of the three individuals are signing as such. As Justice Burke pointed out, Aframian sees that PCH USA 26 LLC on the first guarantee was one of the guarantors. That was not what he wanted. As the e-mail stated, he wanted each and all of the owners to be personally on the hook. If I can reduce, at the risk of reducing your argument to its simplest terms, would it be your position that if we find an ambiguity, then you should win the case? Summary judgment should be added in your favor. Yes, that's correct, Your Honor. Okay. What about how do you respond to his argument that there is all these other factual questions about the understanding of the parties, the individual purported guarantors? Wouldn't that open it up for a hearing on their intent? I don't think so, Your Honor, for two reasons. One, the parties have conceded that there's no dispute of material fact. And two, with respect to the deposition testimony that was offered by opposing counsel, that would not be entitled to as much weight, if any, because you can see from contemporaneous evidence, which would be the e-mails, what exactly the parties were going for. My client had a right to rely on Mr. Santos as the agent for these members that, look, you're getting a blanket personal guarantee. Would he be in any disputes that Santos had anything to do with his clients? The record directly contradicts that, Your Honor. Freeport-Renaissance LLC paid for the document preparation fee. The record clearly establishes that Mr. Santos was acting under the direction of Shiram Aliazade, Ms. Atiguchi's business partner, and she paid him and was aware of that fact. And she stated in her affidavit, as the court pointed out, that she relied on Mr. Santos to prepare those documents. So she should not be able to escape liability based on her saying, well, Mr. Santos is the one who caused this problem, not me. Does this case, to some degree, boil down to this word right here, the guarantor on the signature page of this thing? Because, I mean, if you take this page out of it, would you agree that that guarantee is pretty explicit that Freeport-Renaissance is the guarantor? It is explicit. There's no denying that. I'm sorry. So, again, take this page out of it, out of the guarantee. You lose, right? I don't think so, Your Honor, because as Section 1642, I believe, of the California Civil Code, requires that the court construe the loan documents as a whole. So when looking at the fact that my client lends $600,000, the basis for that debt obligation is the promissory note from Freeport-Renaissance, LLC. It's secured by a deed of trust. That's signed by all the members as members explicitly. And then in addition to that security for the real estate, my client also required a personal guarantee from all the members. There would still be no reason under California law, as explained in the Ramos and Peck cases, to have a guarantee but for the personal obligation of the members. So even if that were true. So there would be an ambiguity in your mind anyway based upon the absurdity? Correct. Okay. That's correct. With respect to Attorney Hampel's argument that the guarantee has additional and different obligations from the note as a reason why it would make sense to have Freeport-Renaissance sign both, that's a non-argument or a non-starter. It makes sense that a guarantee as a different type of agreement would have different language in it. They're not identical. The whole intent of a guarantee is different from that of a promissory note. Unless the Court has further questions, do you have any? No. Thank you for your time. The Court would like to thank the attorneys for their evidence here today. Very well done. And we'll take the case under advisement.